CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
3/23/2018
JULIA C. DUDLEY, CLERK
BY: s/ Carmen Amos
DEPUTY CLERK

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
### LYNCHBURG DIVISION

| | |
|---|---|
| MELVIN MOORE,<br><br>       *Plaintiff*,<br><br>v.<br><br>LIFE INSURANCE COMPANY OF NORTH AMERICA,<br><br>       *Defendant*. | CASE NO. 6:17-cv-00030<br><br>MEMORANDUM OPINION<br><br>JUDGE NORMAN K. MOON |

   This ERISA disability benefits case is before the Court on cross-motions for summary judgment based on the administrative record. Plaintiff Melvin Moore, an engineer by trade, challenges the termination of his long-term disability payments. A threshold issue is whether an abuse of discretion or *de novo* standard of review applies to defendant Life Insurance Company of North America's ("LINA") decision to cease paying benefits under an employer ERISA plan. Because the ERISA plan provides LINA with the discretion to decide claims, the former standard applies.

   As for the merits, there are two issues. One is whether—after receiving 24 months of disability payments—Plaintiff's condition prevented him from performing the duties of "any occupation" he was (or could have reasonably become) qualified for. The other issue is whether Plaintiff's disability was caused or contributed to by an anxiety or depressive disorder, which—under the ERISA plan—would not have entitled him to disability payments beyond 24 months. Reviewing LINA's determination for abuse of discretion, the Court concludes that substantial evidence supported the termination of benefits. Accordingly, LINA's motion for summary judgment will be granted, Plaintiff's motion for summary judgment will be denied, and this case will be dismissed.

## I. THE APPLICABLE STANDARD OF REVIEW

"In reviewing the denial of benefits under an ERISA plan, a court's first task is to consider *de novo* whether the relevant plan documents confer discretionary authority on the plan administrator to make a benefits-eligibility determination." *Woods v. Prudential Ins. Co. of Am.*, 528 F.3d 320, 321–22 (4th Cir. 2008) (emphasis added). The "default standard of review is *de novo*, and . . . an abuse-of-discretion review is appropriate only when discretion is vested in the plan administrator." *Id*. at 322 (summarizing *Firestone Tire & Rubber Co. v. Brunch*, 489 U.S. 101, 115 (1989)). So, while summary judgment requires taking the record in the light favorable to the nonmovant, courts "must also evaluate a denial of benefits under an abuse of discretion standard when . . . an ERISA benefit plan vests discretionary authority." *Vaughan v. Celanese Americas Corp.*, 339 F. App'x 320, 322 (4th Cir. 2009).

In this case, there is a disagreement about what constitutes the "Plan documents." The record contains an Appointment of Claim Fiduciary ("ACF") form. (AR1973). The ACF appoints LINA as "the designated fiduciary for the review of benefits under the Plan identified" as AREVA NP, Inc. The ACF further provides that, as "Claim Fiduciary," LINA "shall be responsible for adjudicating claims for benefits under the Plan" and "deciding any appeals of adverse claim determinations." And most centrally, it grants LINA "the authority, in its discretion, to interpret the terms of the Plan, including the Policies; to decide question of eligibility for coverage or benefits under the Plan; and to make any related findings of fact." Because this language grants discretion to LINA, the sub-issue reduces to whether the ACF counts as part of the ERISA Plan, so as to make its grant of discretionary authority applicable to this case.

Ascertaining what counts as part of the ERISA plan, however, "is not always a clear-cut

task." *Admin. Comm. of Wal-Mart Stores, Inc. Associates' Health & Welfare Plan v. Gamboa*, 479 F.3d 538, 542 (8th Cir. 2007). The Supreme Court has stated bluntly that ERISA's definition of a plan "is ultimately circular," so one "is thus left to the common understanding of the word 'plan' as referring to a scheme decided upon in advance." *Pegram v. Herdrich*, 530 U.S. 211, 223 (2000). More precisely, an ERISA plan is "a set of rules that define the rights of a beneficiary and provide for their enforcement. Rules governing collection of premiums, definition of benefits, submission of claims, and resolution of disagreements over entitlement to services are the sorts of provisions that constitute a plan." *Id*.

This definition contemplates, as the Fourth Circuit indicated in *Woods*, that there are often multiple documents that together represent the whole of the plan. *Woods*, 528 F.3d at 321–22. "ERISA certainly permits more than one document to make up a benefit plan's required written instrument." *Tetreault v. Reliance Standard Life Ins. Co.*, 769 F.3d 49, 55 (1st Cir. 2014); *e.g.*, *Pettaway v. Teachers Ins. & Annuity Ass'n of Am.*, 644 F.3d 427, 433 (D.C. Cir. 2011); *Silverman v. Teamsters Local 210 Affiliated Health & Ins. Fund*, 761 F.3d 277, 286 (2d Cir. 2014) (compiling cases); *Heffner v. Blue Cross & Blue Shield of Ala., Inc.*, 443 F.3d 1330, 1342–43 (11th Cir. 2006). "ERISA's statutory text suggests that multiple plan documents can be legally relevant," and "ERISA sections on fiduciary responsibilities imply that there will be multiple legally important plan documents." *Pettaway*, 644 F.3d at 433–34. As the Seventh Circuit has repeatedly observed, "often the terms of an ERISA plan must be inferred from a series of documents, none clearly labeled as 'the plan.'" *Larson v. United Healthcare Ins. Co.*, 723 F.3d 905, 912 (7th Cir. 2013); *Raybourne v. Cigna Life Ins. Co. of N.Y.*, 576 F.3d 444, 448 (7th Cir. 2009); *Health Cost Controls of Ill., Inc. v. Washington*, 187 F.3d 703, 712 (7th Cir. 1999).

The Court is convinced that the ACF is part of the ERISA Plan. The Seventh Circuit's decision in *Raybourne v. Cigna*, 576 F.3d 444 (7th Cir. 2009) is squarely on point. There, as here, an insurance company pointed to an "Appointment of Claim Fiduciary" form as creating an abuse of discretion standard of review. 576 F.3d at 448. And there, as here, the ACF granted the insurer "the authority, in its discretion, to interpret the terms of the Plan . . . to decide questions of eligibility for coverage or benefits under the Plan." *Id.*[1] That grant of discretion was also described, like here, in a summary plan document ("SPD").

Against these realities, the claimant—like Plaintiff here—asserted that the ACF was not a plan document. *Raybourne* rejected that assertion. 576 F.3d at 448–49. It reasoned that an ERISA plan was not limited to the original, underlying insurance policy. *Id.* at 448. It observed that the contents of the SPD affirmed that the ACF was, indeed, part of the plan. *Id.*; *see also id.* at 449 (finding the ACF's "grant of discretion to Cigna is described in the SPD furnished" to employees.). And the Seventh Circuit found it "difficult to see how [the ACF] could be anything other than a plan document," given that it (1) provided the name of the plan and administrator, (2) was signed by the insurer and plan representatives, and (3) was retroactively effective to the date of the underlying insurance policy. *Id.* at 449; *see* AR1973 (ACF), AR53 (insurance policy cover sheet). In sum, the ACF (both here and in *Raybourne*) set forth some of the "rules that define the rights of a beneficiary and provide for their enforcement," including the "submission of claims and resolution of disagreements over entitlement to services"; these "are the sorts of provisions that constitute a plan." *Pegram*, 530 U.S. at 223.

Plaintiff is wrong that *CIGNA Corp. v. Amara*, 563 U.S. 421 (2011) undercuts

---

[1] *Compare* AR1973 (granting "authority, in its discretion, to interpret the term of the Plan" and "decide questions of eligibility") *with Raybourne*, 576 F.3d at 448 (granting "the authority, in its discretion, to interpret the terms of the Plan . . . to decide questions of eligibility").

– 4 –

*Raybourne*. All *Amara* holds is that the SPD is not, standing alone, a plan document that can create or override terms of the Plan. *Amara*, 563 U.S. at 437; *see id*. at 435–38; *Tetreault v. Reliance Standard Life Ins. Co.*, 769 F.3d 49, 56 (1st Cir. 2014); *Eugene S. v. Horizon Blue Cross Blue Shield of N.J.*, 663 F.3d 1124, 1131 (10th Cir. 2011). *Amara* thus has no bearing on *Raybourne*'s core holding that the ACF is a plan document.

Furthermore, while the SPD is not itself a plan document, nothing in *Amara* forecloses looking at the SPD to help identify what other documents, like an ACF, *do* comprise the Plan. As *Raybourne* put it, an SPD—as a summary document—"does not exist in a vacuum . . . . [it] refers to the [ACF] and explains the discretion that [the ACF] confers." 576 F.3d at 449. So too here. AR2002.[2] *See also* AR72 (policy rider stating that LINA has been designated as the "named fiduciary for deciding claims for benefits under the Plan," as well as appeals). *Amara* does not prohibit considering the SPD's summary language as probative of whether some other document, with parallel language, *is* part of the plan. After all, one expects the SPD, as a summary, to reflect the Plan's terms. And if it does not, only then is *Amara* implicated, instructing that the standalone SPD is not part of the Plan.[3]

---

[2] "The Plan Administrator has appointed the Insurance Company as the named fiduciary for adjudicating claim for benefits under the Plan, and for deciding any appeals of denied claim. The Insurance Company shall have the authority, in its discretion, to interpret the terms of the Plan, to decide questions of eligibility . . . and to make any related findings of fact."

[3] Plaintiff argues that the ACF ineffectually tried to amend the Plan. (Dkt. 24 at 5–6). He relies on the ACF's language authorizing Defendant to issue "appropriate amendments to any *policies* to reflect this appointment and the authority and responsibility granted," and—although the argument isn't well-developed—seemingly contends that no such amendment reflecting the grant of discretion took place. (*Id*. at 6 (emphasis added)).
    This argument, however, elides the distinction between an insurance policy (which is but one component of the Plan) and the Plan itself (which is comprised of several documents, among them an insurance policy and the ACF). The policy itself makes clear that it is but one part of an ERISA plan. (AR72 ("This Policy is *a* Plan document within the meaning of ERISA.")).
    The ACF is also part of the Plan, and the portion of it relied upon by Plaintiff merely

Another point bolsters the conclusion that the ACF is part of the Plan. The ACF states that LINA hears appeals of denied claims. AR1973, 2002. Plaintiff appealed his denial of benefits to LINA several times. *E.g.*, AR1410–14, 1317–29, 1301–15. This course of dealing suggests the parties recognized the ACF as a Plan document. *See U.S. Foodservice, Inc. v. Truck Drivers & Helpers Local Union No. 355 Health & Welfare Fund*, 700 F.3d 743, 750 (4th Cir. 2012).

In the end, Plaintiff's position reduces to reliance on a handful of district court opinions that either overread *Amara*, misunderstand that an ERISA plan can be comprised of multiple documents without explicit integration, or both. *E.g., Moran v. Life Ins. Co. of N. Am. Misericordia Univ.*, No. 3:CV-13-765, 2014 WL 4251604, at *4–9 (M.D. Pa. Aug. 27, 2014); *Barbu v. Life Ins. Co. of N. Am.*, 987 F. Supp. 2d 281, 286–89 (E.D.N.Y. 2013). These decisions are unpersuasive, and the Seventh Circuit's decision in *Raybourne* is better reasoned, factually similar, and consistent with *Amara*.

The abuse of discretion standard "requires a reviewing court to show enough deference to a primary decision-maker's judgment that the court does not reverse merely because it would have come to a different result in the first instance." *Evans v. Eaton Corp. Long Term Disability Plan*, 514 F.3d 315, 322 (4th Cir. 2008). In "ERISA cases, the standard equates to reasonableness." *Id*. at 322. The "administrator's decision is reasonable if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Id*. at 322.

---

authorized a *contractual amendment to the insurance policy* between Defendant and the employer. The portion of the ACF actually granting discretion, however, was effective *for ERISA purposes* simply by virtue of the ACF's status as a Plan document. Put differently, a change to the insurance policy is not required to change the ERISA Plan, although changing the policy would have done so. As it turned out, the ACF had effectuated the change already. (*See* dkt. 28 at 2, 10–11 & n.12).

– 6 –

## II. MERITS ANALYSIS

The Plan in this case provides that, after benefits have been payable for 24 months,[4] the employee remains disabled if "*solely* due" to injury or sickness, he is (1) "unable to perform the material duties of *any* occupation for which he" is, "or may reasonably become, qualified based on education, training or experience," and (2) "unable to earn 60% or more" of his time-adjusted earnings. (AR15). The 24-month period in this definition parallels the Plan's limitation of benefits stemming from mental or psychological conditions ("Mental Health Limitation"). The Mental Health Limitation states that no disability benefits are payable beyond 24 months if the disability is "caused by, *or contributed to by*," several conditions, among them anxiety and depressive disorders. (AR63). These provisions form the basis of this lawsuit. The medical records in this case span several hundreds of pages, so the Court sketches a broad overview of them before diving deeper into the facts during its analysis.

Plaintiff began experiencing, in February 2011, pain and osteoarthritis in his knees and ankle. His orthopedic surgeon, Dr. Michael Diminick, performed minor procedures on Plaintiff's foot and ankle during the first half of 2011, which resulted in some complications (such as pain, swelling, inflammation, and drainage).

By June 2011, there was marked improvement in Plaintiff's pain and foot functionality. But Dr. Diminick kept Plaintiff out of work until a follow-up appointment a month later. At the follow up, Plaintiff reported improvement and was permitted to work 4-hour days by Dr. Diminick. Despite improvement and recommendations that Plaintiff begin exercise, Dr. Diminick kept Plaintiff on that restriction through December 2011, at which time he found

---

[4] Although some termination letters from LINA referenced a 60 month period as part of this definition, *e.g.*, AR565, those references were to a superseded version of the Plan. The Plan was amended, effective January 1, 2011, to utilize a 24-month period. (AR13, 15).

Plaintiff unable to return to work at all, due to recurring pain and swelling. Dr. Diminick cleared Plaintiff to return at the end of January 2012, but that clearance was short-lived. Over the next two years, Plaintiff reported pain in his lower extremities and back, as well as depression and anxiety, and Dr. Diminick limited Plaintiff to either half-days with significant restrictions or no work at all.

Meanwhile, Plaintiff began receiving ERISA disability benefits on August 1, 2011. (AR105). After more than 24 months, LINA terminated benefits in early November 2014 (effective December 12th) after review by two claim managers, a nurse case manager, and a rehabilitation specialist. (AR565–66). The letter cited the "any occupation" standard of disability, and detailed its review of Plaintiff's medical records obtained from his two treating physicians: Dr. Gertrude Shahady (primary care) and Dr. Diminick. (AR565–66). LINA found that Plaintiff no longer was disabled under the "any occupation" standard. (AR567). Although LINA did not dispute Plaintiff may have been somewhat limited or restricted, it found that "an explanation of your functionality and how your functional capacity prevents you from continuously performing the material duties of any occupation are [sic] not clinically supported." (AR567). Plaintiff undertook a series of internal appeals with LINA, relying on Dr. Shahady's and Dr. Diminick's records and opinions, as well as citing to his self-reports of pain and functionality. (AR1201–15, 1317, 1325–29). During this back and forth, LINA also relied on the ERISA Plan's Mental Health Limitation. LINA ultimately denied each appeal until it issued a final denial letter on March 1, 2017. (AR540–42, 517–20). Plaintiff filed this lawsuit in April 2017.

A. The "Any Occupation" Standard

In terminating benefits, LINA relied upon the Plan's any occupation standard, whereby

Plaintiff—to continue receiving benefits after 24 months—had to be unable to perform the material duties of any occupation he was or could reasonably become qualified for. LINA concluded that Plaintiff could work in various engineering capacities that, unlike his original position, were sedentary. (AR519, 541–42). LINA's main argument is that its medical reviewers reasonably concluded—contrary to Plaintiff's treating physicians—that Plaintiff was not disabled under the "any occupation" standard, because the treating physicians' conclusions were not clinically supported. Plaintiff's position is that LINA improperly ignored his treating physicians' opinions and his reports of pain, which prove he could not perform even sedentary jobs.

There is no dispute that Plaintiff suffered from medical ailments, such as complications from his foot survey as well as pain making ambulation, standing, and sitting for prolonged periods difficult. Nonetheless, LINA did not abuse its discretion when finding that Plaintiff had enough functionality and skills to satisfy the any occupation standard for a sedentary engineering job.

In April 2012, Plaintiff reported "numerous illnesses," but medical "[e]xamination findings were unremarkable." Plaintiff began reporting back and left arm pain. Nonetheless, Dr. Christopher Lewis indicated Plaintiff could work. Dr. Lewis's April 17th physical ability assessment found that Plaintiff had significantly more physical capacity than Dr. Diminick had reported in an assessment just two days prior. And primary care physician Shahady likewise found, on April 16th, Plaintiff capable of working.

In a May 2012 response to a request from LINA for "specific, measurable, objective examination finding that exist which demonstrate functional impairment and support [Dr. Diminick's] restriction of 4 hour work days," Dr. Diminick summarily scribbled "severe, poorly

control hypertension" and "persistent, chronic foot and ankle pain." (AR1698). No tests, reports, or examination findings were provided, and nor was there a logical bridge build between those conditions and the inability to work a full day. At approximately the same time, Dr. Shadahy "tried to have a frank discussion with [Plaintiff] about when to get back to work," as she "didn't really see why [Plaintiff] would need further restrictions." (AR1688). In 2013 or 2014, Dr. Diminick reported in a physical ability assessment that Plaintiff could constantly grab and manipulate objects, frequently reach at desk or below-waist level, and occasionally stand, walk, or sit. (AR1450–51).[5] Dr. Diminick reached the same conclusions in an October 1, 2014 assessment, shortly before LINA terminated benefits. (AR1472–73). Just two weeks later, Dr. Diminick—although opining that Plaintiff was "incapable of returning to work"—failed to fill out a physical ability assessment. (AR1514–15).

Dr. Abraham, an independent reviewer who spoke with Dr. Diminick and reviewed Plaintiff's file, was entitled to consider this somewhat equivocal evidence and reasonably conclude that, while Plaintiff "requires medically necessary work limitations and restriction," he nonetheless "could perform on a full-time, 8 hour per day, 5 day a week capacity" with such limitations. (AR1399).

Another independent reviewing doctor, internist Louise Banks, reported that, during a phone call with Dr. Diminick, he was "unable to give me specifics regarding [Plaintiff's] lower extremity orthopedic problems which would result in restrictions" because Dr. Diminick "does not do spine." (AR1758). Dr. Banks acknowledged Plaintiff's physical limitations and that some restrictions are necessary (such as frequently changing positions for comfort), but she did "not see a reason to limit reach or use of hands, as [Plaintiff] is consistently documented to have

---

[5] The dates on this physical ability assessment are inconsistent, it having been signed ostensibly on "7/8/13" but based on a "9/18/14" physical assessment.

a normal cervical spine exam and has no documented complaints related to shoulder and upper extremities." (*Id*.). Dr. Banks also concluded that a 2016 functional capacity exam did not adequately represent Plaintiff's abilities because, as documented by the administering therapist, its results were consistent with "sub-maximal effort." (AR1759; *e.g.,* AR1923, 1930, 1932).

Dr. Elena Antonelli also reviewed Plaintiff's file and—while acknowledging certain restrictions were supported by the documentation—found "the limitation of work to four hours of work per day is not supported": After October 2012, Plaintiff could "constantly reach, do fine manipulation, simple and firm grasping, and could occasionally carry or lift up to 20 pounds." (AR1660). Plaintiff "would have required the use of sneakers [for his foot and ankle pain] but there is no evidence that he had been unable to work a full day with these restrictions in place," and the file before Dr. Antonelli "does not clearly support the significant restrictions on the length of the work day that were placed on [Plaintiff] by Dr. Diminick." (AR1660).

In light of these disparate medical views, LINA was entitled to favor the opinions of Drs. Abraham, Banks, and Antonelli that Plaintiff was capable for working an 8-hour workday, especially in light of Dr. Diminick's often sparse justifications for his conclusions and Plaintiff's restrictions, which sometimes exceeded Diminick's bailiwick as an orthopedist. *Evans v. Eaton Corp. Long Term Disability Plan*, 514 F.3d 315, 323–26 (4th Cir. 2008) (affirming ERISA disability denial under abuse of discretion standard with conflicting testimony from treating and reviewing physicians); *Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan*, 201 F.3d 335, 345 (4th Cir. 2000) ("it is not an abuse of discretion for a plan fiduciary to deny . . . benefits where conflicting medical reports were presented"). Moreover, LINA was neither required to accept or allowed to reject Plaintiff's account of his pain out of hand, *DuPerry v. Life Ins. Co. of N. Am.*, 632 F.3d 860, 874 (4th Cir. 2011), and the record reveals it abided by that principle. It

undertook a months-long review process, engaging multiple doctors and other healthcare professionals who reviewed Plaintiff's records, spoke with his treating physicians, and explained their conclusions. As noted above, these professionals did not summarily dismiss Plaintiff's reports of pain, and they acknowledged that some accommodations were necessary. But the doctors also reasonably concluded that the restrictions placed on him were not medically supported to the extent it would render him unable to perform a sedentary engineering job, and LINA was entitled to agree with them. Indeed, LINA credited a physical ability assessment performed by Plaintiff's primary care physician, Dr. Shahady, in finding that other occupations Plaintiff were qualified for existed in the local labor market. (AR1460–64). All told, LINA did not abuse its discretion when determining Plaintiff was not disabled under the "any occupation" standard.

### B. Mental Health Limitation

Even if LINA erred by finding Plaintiff not disabled under the any occupation standard, terminating benefits was justifiable under the Plan's Mental Health Limitation, restricting benefits to 24 months for disabilities "caused by, or contributed to by . . . [a]nxiety disorders" or "[m]ental illness." (AR63). Substantial evidence supports the conclusion that Plaintiff's disability, for which he had already received over 24 months of benefits, was indeed contributed to by anxiety and depression.

Evidence from both Plaintiff's self-assessments and his doctors amply reflects that—for more than 24 months prior to the December 2014 termination of benefits—Plaintiff's anxiety and depression "contributed to" his disability. As far back as August 2011, Plaintiff reported on a disability questionnaire that he is "depressed most of the time," and listed "stress, depression" as among the reasons he could not work. (AR1095, 1097). In October 2011, Dr. Diminick

observes "a depressed affect" in Plaintiff. (AR967).

In April 2012, Dr. Shahady noted "ongoing depression and anxiety," and diagnosed him with "depression and anxiety." (AR1689). A month later, Dr. Shahady wrote in Plaintiff's file that another doctor had relayed his belief that Plaintiff's "blood pressure was very tied in to anxiety" and he should "see a psychiatrist." (AR1688). Dr. Shahady stated that Plaintiff reported "dealing with other areas that he is not comfortable discussing." (AR1688). Dr. Shahady further noted Plaintiff's "ongoing obvious anxiety," and that she would "be in agreement with him seeing a psychiatrist." (AR 1688).

Dr. Diminick likewise observed Plaintiff's anxiety in June 2012. Two days after that observation, Plaintiff himself explained in his appeal to LINA that Dr. Shahady "had me out [of] work to get control of my anxiety attacks . . . & depression." (AR1670). Plaintiff reported to his doctors in July 2012 that "he has been having quite a few anxiety attacks." (AR1545). Dr. Diminick concluded that Plaintiff had "depression and anxiety" and that Plaintiff "still is significantly disabled by these conditions." (AR1545). In August, Dr. Diminick opined that depression and anxiety were still a significantly disabling issue for Plaintiff, an opinion recorded again in notes from November 2012. (AR1601, 1546). And doctors' notes from 2013 through the first half of 2014 describe Plaintiff as depressed, having "reported persistent depression for 2 years." (AR1389; *e.g.*, AR1884–85, 1874, 1876, 1878). In fact, Dr. Diminick opined around the time Plaintiff's benefits ended that he was an "emotional wreck," and remarked that Plaintiff was unable mentally to "engage in stressful situations or engage in interpersonal relations." (AR1402).

From all this evidence it was reasonable—and thus not an abuse of discretion—to conclude that Plaintiff's anxiety and depression "contributed to" his disability for at least 24

months prior to the December 2014 termination of benefits, and therefore that Plaintiff was not entitled to additional benefits.

The closer issue is whether this justification for denying benefits is properly before the Court. LINA's initial denial letter did not discretely identify the Mental Health Limitation as a basis for its decision. (AR565–67). Pointing to a Fourth Circuit case that limited an insurer's arguments to those presented in its initial denial letter, *Thompson v. Life Ins. Co. of N. Am.*, 30 F. App'x 160, 164 (4th Cir. 2002), Plaintiff asserts LINA cannot rely on the Mental Health Limitation now. A few points, however, undercut Plaintiff's position.

First, the Fourth Circuit has since stated in a published opinion that this aspect of *Thompson* "appears incorrectly decided." *Gagliano v. Reliance Standard Life Ins. Co.*, 547 F.3d 230, 237–38 & n.5 (4th Cir. 2008).

Second, Plaintiff received a "full and fair review" of his claims, as he had an opportunity to advance his position to LINA before this case. 29 U.S.C. § 1133. Specifically, Plaintiff was able to contest, during the administrative review stage and prior to judicial review, LINA's reliance on the Mental Health Limitation and develop the record accordingly. The Plan provides that administrative appeals are considered without deference to the prior decision and by a different, independent reviewer. (AR73, 2002–03). While LINA relied on the Mental Health Limitation in its first appeal decision affirming its termination of benefits, that was not the end of the matter. (AR541–42). LINA invited a second appeal, AR542, and Plaintiff responded with an extensive submission. (AR1317–30). Plaintiff also submitted a 15-page supplemental document three months later, further expounding on his position based on both the law and the medical evidence. (AR1301–15). Hence, Plaintiff was afforded a "full and fair review" of the issue during the administrative process with LINA, including the ability to develop the evidence

and his arguments before LINA before it made a final decision.

All told, the Mental Health Limitation also supports LINA's decision. *E.g.*, *Tumbleston v. A.O. Smith Corp.*, 28 F. App'x 231, 237–38 (4th Cir. 2002)

### C. A Note on the *Booth* Factors

Usually in an ERISA case, the parties' arguments are channeled through the eight nondispositive *Booth* factors: "(1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have." *Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan*, 201 F.3d 335, 342–43 (4th Cir. 2000). Here, however, the parties have not cited *Booth*, much less analyzed each factor. The Court raises this point merely to observe that it is aware of the *Booth* factors and has considered them, with most of them—*e.g.*, plan language, adequacy, decisionmaking process—subsumed within the above analysis.

While "[a]ll eight *Booth* factors need not be, and are not, in play in this case," *Helton v. AT & T Inc.*, 709 F.3d 343, 357 (4th Cir. 2013), the Court does briefly remark upon the last one, conflict of interest. Plaintiff's briefs mentioned the issue but once and only in passing, dkt. 18 at 3, thus waving it. *Walker v. Prince George's Cty., Md.*, 575 F.3d 426, 428–29, n.\* (4th Cir. 2009); *Liberty Corp. v. NCNB Nat. Bank of S.C.*, 984 F.2d 1383, 1390 (4th Cir. 1993). With the lack of a record on this factor, it can hardly be relied upon to undermine LINA's decision.

*Fortier v. Principal Life Ins. Co.*, 666 F.3d 231, 236 n.1 (4th Cir. 2012). And LINA has in any event ably explained why any conflict that might exist does not undercut its decision. (Dkt. 23 at 20 n.11; dkt. 28 at 18 n.16).

\*   \*   \*

For the above reasons, LINA's motion will be granted and Plaintiff's motion will be denied. An appropriate order will issue. The Clerk is directed to send a copy of this opinion and the accompanying order to counsel.

Entered this  23rd  day of March, 2018.

*/s/ Norman K. Moon*
NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE